IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN L. KNEPPER | ‖ | |
| Plaintiff, | ‖ | No. 11-CV-4034-DEO |
| v. | ‖ | |
| MICHAEL J. ASTRUE, | ‖ | ORDER |
| Commission or Social Security | ‖ | |
| Defendant. | ‖ | |

_____

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court on Plaintiff John L. Knepper's Complaint seeking disability benefits under 42 U.S.C. §§ 401 et seq. of the Social Security Act (the "Act"). Docket No. 2.

Plaintiff received a bachelor's degree in 1984.  Tr. 18. From 1985 to 2004, he worked as a middle school teacher; and, except for a brief stint as a substitute teacher from September 1, 2006, through March 27, 2007, he has otherwise been unemployed throughout his alleged period of disability. Tr. 18.

Plaintiff's initial claim for disability, filed on July 30, 2007, was denied on August 24, 2007, and his request for review was denied on December 21, 2007.  On July 22, 2009, an Administrative Law Judge (ALJ) held a hearing to consider Plaintiff's claim; and in a decision dated July 30, 2009, the ALJ denied Plaintiff's claim.  Tr. 14-24.  On January 26, 2011, the Social Security Appeals Council denied Plaintiff's request for review.  Tr. 1.  On March 30, 2011, Plaintiff timely filed his complaint with this Court.  Docket No. 2.  This Court has jurisdiction to review the decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).

Plaintiff alleges a disability onset date of August 13, 2004.  Tr. 14.  The relevant time period for this Court's consideration is Plaintiff's alleged onset date to the date of the ALJ's decision on July 30, 2009.

Plaintiff is currently 60 years old and married.  Tr. 18. His wife is an English Professor at Morningside College in Sioux City, Iowa.  Tr. 18.

## II.  MEDICAL EVIDENCE

In the past ten years, Plaintiff has had a number of physical ailments, including Type II diabetes,[1] hypertension, obesity, hyperlipidemia, hypothyroidism,[2] anemia,[3] strangulated umbilical hernia,[4] and a cranial hemorrhage and related

---

[1] "Type 2 diabetes, often called non-insulin dependent diabetes, is the most common form of diabetes, affecting 90% - 95% of the 21 million people with diabetes . . .  Unlike people with type 1 diabetes, people with type 2 diabetes produce insulin; however, either their pancreas does not produce enough insulin or the body cannot use the insulin adequately . . .  When there isn't enough insulin or the insulin is not used as it should be, glucose (sugar) can't get into the body's cells.  When glucose builds up in the blood instead of going into cells, the body's cells are not able to function properly." *Type 2 Diabetes Overview*, WebMD, available at http://diabetes.webmd.com/guide/type-2-diabetes, last visited 09/26/2012.

[2] "Hypothyroidism is a condition in which the thyroid gland does not make enough thyroid hormone," resulting in depression, fatigue, joint or muscle pain, dry skin, thin and brittle hair and fingernails, weakness, and weight gain. *Hypothyroidism*, PubMed Health, available at http://www.ncbi.nlm.nih.government/pubmedhealth/PMH0001393/, last visited 09/26/2012.

[3] "Anemia is a condition in which the body does not have enough healthy red blood cells.  Red blood cells provide oxygen to body tissues." *Anemia*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001586/, last visited 09/26/2012.

[4] "A hernia occurs when the contents of a body cavity bulge out of the area where they are normally contained. These contents, usually portions of intestine or abdominal

stroke.  However, Plaintiff's claim is predominantly based on his Bipolar Disorder, and so these physical ailments, though this Court is mindful that they have a serious effect on Plaintiff's standard of living and no doubt negatively affect his mental condition, are not considered within this Memorandum and Opinion Order in detail.

Plaintiff was initially diagnosed with Bipolar Disorder in 1973, and, early in his adult life, was subjected to multiple hospitalizations and electro-shock-therapy.  Tr. 140 and 156.  Plaintiff has attempted suicide numerous times throughout his life.  Tr. 156.

Since Plaintiff's alleged onset of disability, he has been treated with lithium,[5] a number of different anti-

_____

fatty tissue, are enclosed in the thin membrane that naturally lines the inside of the cavity.  Hernias by themselves may be asymptomatic (produce no symptoms) or cause slight to severe pain.        *Hernia*,        emedicinehealth,        available        at http://www.emedicine_health.com/hernia/article_em.htm,  last visited 09/26/2012.

[5] "Lithium is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder, a disease that causes episodes of depression, episodes of mania, and other abnormal moods).  Lithium is in a class of medications called antimanic agents.   It works by decreasing abnormal activity in the brain." *Lithium*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531/, last visited 09/26/2012.

depressants, and several medications designed to help control his diabetes, hypertension, hyperlipidemia, hypothyroidism, and anemia.  Tr. 153, 174, 192, 203, and 298.

Plaintiff's mental health records from March of 2004 through September of 2006 are unremarkable, excepting a dangerous drug interaction in the summer of 2005, resulting in severe dehydration and azotemia, a condition characterized by abnormal levels of nitrogen compounds in the body.  Tr. 247 and 380-87.  During this period of brief hospitalization, Plaintiff suffered from paranoia, "dizziness, sleep disturbances, hallucinations, worsening mania of his bipolar illness, trembling of his arms and hands, diarrhea," and difficulties speaking and walking.  Tr. 267.  Once Plaintiff was rehydrated, he recovered quickly and fully and was released from the hospital.  Tr. 266 and 271.  During the balance of this roughly two year period, Plaintiff, though he occasionally experienced mild depression, exhibited no extreme mood shifts or serious signs of depression.  Tr. 380-87. Plaintiff's treating physician during this period, Dr.

Wassmuth, invariably assigned Plaintiff a Global Assessment of Functioning (GAF)[6] of 81.[7]  <u>Id.</u>

In May 1, 2007, Plaintiff first visited Dr. Skorey.  Tr. 388-89.  Plaintiff reported he was not feeling well and thought he was entering into a cycle of depression.  Plaintiff also reported he had recently been to London and enjoyed himself, but he appeared sad and his mood and affect were somewhat "dysphoric[8] and restricted."  Tr. 388.  Though he denied suicidal ideation, he did report that he had attempted

---

[6]   The GAF Scale is a standardized scale used to track "the clinical progress of individuals in global terms, using a single measure . . . The GAF scale is divided into 10 ranges of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed., Text Revision 2000).

[7]   A score of 81 indicates a person is at the low end of a range used to describe people with no or "minimal symptoms . . . good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).

[8] Dysphoria is "a sudden and transient state of mind, such as feelings of sadness, sorrow and anguish.  It is a psychological condition accompanied by depression, melancholy and pessimism." *Dysphoria Definition*, Dysphoria.Info, available at http://www.dysphoria.info/, last visited 09/26/2012.

to commit suicide in the past but ultimately could not go through with it.  Tr. 388.  Dr. Skorey assigned Plaintiff a GAF of 57.[9]  Tr. 389.  Two weeks later, Plaintiff reported depressed episodes, including thoughts of self-harm without any overt plans.  A month later, Plaintiff continued to report "a fair amount of dysphoria."  Tr. 390 and 392.

On July 23, 2007, PA Middleton examined Plaintiff. Plaintiff reported things were improving, and he was able to find interest in things going on around him.  Tr. 254.  PA Middleton indicated Plaintiff was well groomed and his thought process was organized, coherent, and goal directed.  Tr. 254. She assigned Plaintiff a GAF of 70.[10]  Tr. 254.

On a visit to PA Middleton on November 13, 2007, Plaintiff reported he was somewhat irritable but his mood was improving.  Tr. 255.  PA Middleton was part of the same

---

[9] A score of 51 to 60 indicates "[m]oderate symptoms . . . or "moderate difficulty" in social or occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).

[10] A GAF score of 61 to 70 indicates "[s]ome mild symptoms" or "some difficulty" in social or occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).

treatment team as Dr. Skorey and later Dr. Muller.   Though Plaintiff's new anti-depressant resulted in vivid dreams, he was tolerating it fairly well.   Tr. 255.   Overall, he appeared "mildly depressed."   Tr. 255.

On August 22, 2007, Dr. Notch, a non-examining DDS employee, filled out a psychiatric review form indicating Plaintiff did not qualify for disability.   Tr. 225-239.   Dr. Notch concluded:

> The claimant does have a severe impairment which appears to be well controlled on medication.   There is no evidence in file that would indicate his inability to perform his job if he was motivated to do so.   While he struggled briefly at the time of his [alleged onset of disability], his impairment has responded well to treatment and his symptoms appear to have resolved. His impairment presents no more than a minimal impact on his ability to work and would be considered to be non severe.

Tr. 237.

On January 9, 2008, PA Middleton indicated Plaintiff was experiencing "increasing symptoms of depression," which was consistent with his "history of cycling into depressive modes."   Tr. 520.   Plaintiff's speech was slow, he was experiencing suicidal ideation, and he exhibited "psychomotor retardation."   <u>Id.</u>   PA Middleton altered Plaintiff's

8

depression medication and concluded:  "At baseline, he shows chronic disability despite multiple attempts at different medication regimens."  Id.

Notes from Dr. Muller, dated January 23, 2008, indicate Plaintiff was cycling back into a period of depression.  Tr. 519.  Subsequent notes from PA Middleton, dated March 26, 2008, indicate Plaintiff was feeling better with improved mood and mild depression, though he was "more weepy" than usual. Tr. 517.  On May 26, 2009, Dr. Blankenship, who saw Plaintiff for his various physical impairments, indicated Plaintiff's anxiety and depression were not "currently well controlled." Notes from PA Middleton, dated May 28, 2008, indicate Plaintiff reported additional improvement; he felt he was finally "cycling out of the depression he [had] been in."  Tr. 516.

On February 25, 2009, PA Middleton indicated Plaintiff was showing signs of mild depression, and though he had no active plans, he indicated "he thinks about death quite a bit."  PA Middleton summarized that Plaintiff

9

> has days that are difficult for him in
> terms of depression, then he has periods
> where it lifts.   However, it's quite
> encompassing for him.  He is able to read
> and enjoy some things at home but still not
> fully able to be out in the world in any
> way.

Tr. 514.

On June 22, 2009, PA Middleton indicated Plaintiff was

"currently fairly stable in terms of any mania or hypomania;

however, he continues to have depressive symptoms." Tr. 206.

Plaintiff's speech was soft and low, and he exhibited minor

psychomotor retardation.  Tr. 206.  He also had problems with

memory and judgment but interacted fairly well.  Tr. 206.  PA

Middleton also indicated that though Plaintiff had tried a

variety of anti-depressants, he has repeatedly experienced

adverse reactions.  Tr. 206.  She concluded that Plaintiff

> [c]ontinues to be unable to work, would
> certainly lack the ability to interact
> appropriately in terms of his energy level
> and connectedness to other people.   In
> addition, his symptoms vary and it would be
> very difficult for him to have a level of
> reliability in terms of his function on any
> given day.

Tr. 206-07.

On June 29, 2009, Dr. Phillip Muller conducted a psychiatric examination of Plaintiff. Tr. 510-11. He indicated Plaintiff appeared disheveled and reported occasional suicidal thoughts but no overt plans. Tr. 511. A mental status exam was positive for agoraphobia, a fear of crowds, and anhedonia, a general inability to experience pleasure. Tr. 511. Plaintiff reported a lack of motivation and a history of being unable to accomplish things he set out to do. Id. In regard to Plaintiff's ability to work, Dr. Muller concluded,

> he would have difficulty with any type of conflicts at work. It would cause him further problems with his depression, this would cause him difficulties with working with supervisors and peers. If the classroom would get noisy or have conflict, he would have difficulty with the children. It would cause further problems with his depression. He has shown a history of problems with punctuality and the ability to come to work, which has caused him to lose jobs in the past.

Tr. 511.

On September 24, 2009, PA Middleton's notes indicate Plaintiff was doing "fairly well." Tr. 515. Plaintiff was still experiencing depression on some days, but it did not

"linger."   Tr. 515.   Plaintiff was also experiencing some difficulty with motivation.   Tr. 515.

## III.   LAYPERSON EVIDENCE

In an Adult Function Report, dated August 11, 2007, Plaintiff claimed he sometimes went days without caring for his hygiene and suffered from a general lack of motivation. Tr. 134 and 175.   He prepared his own meals and did minor housework when his illness permitted.   He left the house rarely, mostly watched TV and read, and described himself as anti-social.   Tr. 135-37.   His illness caused him to accentuate negative thoughts and left him often feeling hopeless and unmotivated.   Tr. 138.   He often had bouts of anger and can became overwhelmed by stress.   Tr. 138.   His ability to concentrate was limited, and, over the years, he isolated himself from friends and family.   Tr. 138.   When confronted with minimal stress, he often became physically ill or depressed.   Tr. 139.

In a November 12, 2007, statement to Disability Determination Services (DDS), Plaintiff pleaded:

> I don't know how to say it more strongly
> than this:  I am not functioning well at
> all and cannot work any kind of job that
> requires contact with people, paperwork,

> predictable hours, or even minimal stress.
> I am very irritable and depressed,
> housebound, anti-social, and unable to even
> care for personal hygiene much of the time.
> Since I filled out the previous
> application, I have left the house even
> less and am not able to predict, from day
> to day, whether I will be able to do
> anything at all the next day other than sit
> in a chair. This is very frustrating for
> me because I am a smart person and not a
> lazy person. For years I worked at a high
> stress job (teaching in an inner city
> middle school) with a serious bipolar
> disorder. Apparently the years of stress
> have taken a toll on my mind and body.

Tr. 167.

On December 7, 2007, Plaintiff's wife, Mrs. Knepper, filled out a Third Party Adult Function Report. 178-185. She indicated Plaintiff's illness negatively affected his memory, concentration, ability to complete tasks, sleep patterns, and ability to concentrate. Tr. 178 and 183. She also indicated Plaintiff's mood was unpredictable from day to day, and, some days, he was unable to even do simple household chores or bathe. Tr. 178. Mrs. Knepper also noted that her husband's depression was causing weight gain and his inability to handle stress often resulted in physical ailments. Tr. 184. She summarized:

> Besides the depression, anger, and
> inability to handle stress and social
> interactions, a major reason that John
> cannot work <u>any</u> job is that he can never
> predict how he will feel on any given day.
> On the best days, he barely manages to
> control his moods and does little; on his
> worst days he is angry, despairing, and
> unable to do anything but sit in a chair
> and watch TV or sleep.  Since we have been
> together for 38 years, John can be himself
> with me, and I can ignore his moods.  With
> others, even his family, he often has a
> very hard time following through with
> commitments, controlling anger, and
> behaving appropriately . . .  The lithium
> seems to control extreme mania, but the
> anti-depressants (he has tried several in
> the past couple of years) no longer seem to
> work.

Tr. 186.

In a letter, dated July 22, 2009, written to the ALJ, Plaintiff's wife reiterated her concerns expressed in her Third Party Function Report of 2007, but added that there "is now virtually no hope that an antidepressant can be found that will work . . . ."  Tr. 220.  According to Mrs. Knepper, Plaintiff rarely left the house any longer, spent some days curled up in a chair, had no social life for almost a decade, and had "been seriously depressed nearly non-stop since 2007."  Tr. 220.

An affidavit, dated July 15, 2009, from Plaintiff's former supervisor, Peter Hathaway, indicates Plaintiff's condition got progressively worse over time, culminating in 20% absentee rate in his final year of employment in 2004. Tr. 210.  Mr. Hathaway also indicated Plaintiff had increasing difficulties controlling his students and relating to his peers, supervisors, and the parents of some of his students. Tr. 210.  He reported that "[p]eople often found [Plaintiff] oppositional and combative, and as a result, those who worked closely with him 'walked on eggs,' never knowing exactly what response to expect from" him.  Tr. 211.  Mr. Hathaway noted that had Plaintiff "not resigned voluntarily, his performance had deteriorated to the point that termination proceedings would have been inevitable."  Tr. 211.

A letter, dated September 20, 2009, from Plaintiff's brother-in-law, indicates Plaintiff had suffered from bi-polar disorder since the 1970's; and, while Plaintiff used to attend family functions, he had not attended one in 8 years, including the funeral of his father-in-law.  Tr. 9.

A letter, dated September 23, 2009, from Plaintiff's brother, indicates Plaintiff was diagnosed with manic

15

depression in 1973.  Tr. 10.  It also indicates that since Plaintiff quit his teaching job in 2004, he rarely leaves his home due to depression; and, though Plaintiff is close to his family and they live in the same community, he only sees them 5 to 6 times a year for short periods of time.  Tr. 10. Plaintiff's brother concludes:

> It is difficult for him to be around people, even with us, for more than an hour or two at a time.  Any sort of employment would be exceedingly difficult, if not impossible for him to do on any regular basis.

Tr. 10.

## IV.  LAW AND ANALYSIS

In order for a plaintiff to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the "Act").  The Act defines disability as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1)(A).

16

A.  **The ALJ's Decision**

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits.  20 C.F.R. § 404.1520.  The five successive steps are:  (1) determination of whether a plaintiff is engaged in "substantial gainful activity," (2) determination of whether a plaintiff has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether a plaintiff's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether a plaintiff's Residual Functional Capacity (RFC) indicates an incapacity to perform the requirements of his past relevant work, and (5) determination of whether, given a Plaintiff's RFC, age, education and work experience," a plaintiff can "make an adjustment to other work."  20 C.F.R. § 404.1520(4)(i-v).

At step one, if a plaintiff is engaged in "substantial gainful activity" within the claimed period of disability, there is no disability during that time.  20 C.F.R. §

404.1520(a)(4)(i).   The ALJ determined Plaintiff had not
engaged in substantial gainful activity since his alleged
onset date, August 13, 2004.   Tr. 16.

At step 2, if a plaintiff does not have a "severe
medically determinable physical or mental impairment" that
lasts at least 12 months, there is no disability.   20 C.F.R.
§ 404.1520(a)(4)(ii).   The ALJ determined Plaintiff had the
following severe impairments:   bipolar disorder, diabetes
mellitus, obesity, sleep apnea, and history of a hernia
repair.   Tr. 17.

At step 3, if a plaintiff's impairments meet or medically
equal the criteria of an impairment listed in 20 C.F.R. Part
404, Subpart P, Appendix 1, and last at least 12 months, a
plaintiff is deemed disabled.   20 C.F.R. § 404.1520(e).   The
ALJ determined Plaintiff did not have an impairment or
combination of impairments that met or medically equaled a
listed impairment.   Tr. 17.

Before proceeding to step 4 and 5, the ALJ must determine
a plaintiff's RFC.   RFC is the "most" a person "can still do"
despite their limitations.   20 C.F.R. § 404.1545(a)(1).   The
ALJ determined Plaintiff had the following RFC:

18

> to perform medium work as defined in 20
> C.F.R. § 404.1567(c) except the [Plaintiff]
> cannot lift more than 50 pounds
> occasionally or more than 25 pounds
> frequently. He has no restrictions in the
> ability to stand, sit, or walk. The
> [Plaintiff] is mentally limited due to
> stress and social interactions with adults.
> Mental: The [Plaintiff] can interact
> socially for brief and superficial work,
> should avoid constant/intense/frequent
> interaction.

Tr. 18.

At step 4, if, given a plaintiff's RFC, a plaintiff can still perform their past relevant work, there is no disability. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ determined Plaintiff was unable to perform any past relevant work. Tr. 23.

At step 5, if, given a plaintiff's RFC, age, education, and work experience, plaintiff can make an adjustment to other work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). This step requires the ALJ to provide "evidence" that a plaintiff could perform "other work [that] exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In other words, at step 5, the burden of proof shifts from a plaintiff to the Commissioner of the S.S.A.. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th

Cir. 1984).   At the administrative level, an ALJ generally calls a Vocational Expert (VE) to aid in determining whether this burden can be met.

In this case, the ALJ determined that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. Tr. 23.   The ALJ's decision was based on the testimony of a VE, whom, when given Plaintiff's RFC as determined by the ALJ, concluded Plaintiff could perform the job of housekeeper, packager, stock clerk, and approximately 40% of all unskilled jobs at the light and medium exertional levels found in the DOT.   Tr. 24 and 44.

**B.   Standard of Review**

This Court's role in review of the ALJ's decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Finch v. Astrue, 547 F. 3d 933, 935 (8th Cir. 2008).   Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question.   Juszczyk v.

<u>Astrue</u>, 542 F.3d 626, 631 (8th Cir. 2008) (citing <u>Kirby v.</u>
<u>Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007)).  This Court must
consider both evidence that supports and detracts from the
ALJ's decision.  <u>Karlix v. Barnhart</u>, 457 F.3d 742, 746 (8th
Cir. 2006) (citing <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th
Cir. 1996)).  In applying this standard, this Court will not
reverse the ALJ, even if it would have reached a contrary
decision, as long as substantial evidence on the record as a
whole supports the ALJ's decision.  <u>Eichelberger v. Barnhart</u>,
390 F.3d 584, 589 (8th Cir. 2004).  The ALJ's decision shall
be reversed only if it is outside the reasonable "zone of
choice."  <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir.
2006) (citing <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th
Cir. 1994)).

This Court may also ascertain whether the ALJ's decision
is based in legal error.  <u>Lauer v. Apfel</u>, 245 F.3d 700, 702
(8th Cir. 2001).  If the ALJ applies an improper legal
standard, it is within this Court's discretion to reverse
his/her decision.  <u>Neal v. Barnhart</u>, 405 F.3d 685, 688 (8th
Cir. 2005); 42 U.S.C. 405(g).

In this case, Plaintiff presents two general arguments for reversal of the ALJ's decision:  (1) the ALJ failed to properly weigh the medical evidence of record; and (2) the ALJ failed to properly consider the layperson evidence, including the Plaintiff's subjective allegations.

## C.  The Plaintiff's RFC and the Medical Evidence

The RFC an ALJ assigns a plaintiff has been referred to as the "most important issue in a disability case . . . ." Malloy v. Astrue, 604 F. Supp. 2d 1247, 1250 (S.D. Iowa 2009) (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)).  When determining RFC, the ALJ must consider all of the relevant evidence and all of the Plaintiff's impairments, even those which are not deemed severe, as well as limitations which result from symptoms, such as pain.  20 C.F.R. § 404.1545(a)(2) and (3).

Particularly important for arriving at a proper RFC is the medical evidence.  If the medical evidence on record is inconsistent, an ALJ has a duty to weigh the evidence. 20 C.F.R. § 404.1527(c)(2).  It is axiomatic that an ALJ shall refrain from "playing doctor." Pate-Fires v. Astrue, 564 F.3d 935, 946-947 (8th Cir. 2009).  An ALJ "may not simply draw his

own inferences about a plaintiff's functional ability from medical reports." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).

In this case, it is unclear what medical evidence the ALJ's RFC determination was based. The ALJ explicitly criticized PA Middleton, indicated the non-examining state-agency consultants were given only enough weight to suggest "that the claimant's functional limitations are not as serious as he alleges" (which is puzzling at best), hand picked a small portion of Dr. Muller's opinion to constitute the entirety of Plaintiff's mental RFC without explaining the weight given to the remainder of his opinion, and otherwise refrained from explaining the weight given to other medical sources. The remainder of the ALJ's decision relating to Plaintiff's RFC is little more than a rendition of disparate facts, which appear to have been selected because they are unfavorable to the Plaintiff. Thus, it is apparent on the face of the ALJ's decision that he failed to live up to his duty to properly weigh the medical evidence.

A historical review of the Plaintiff's medical records reveals that from 2004 through much of 2007, there is little

23

to no evidence indicating Plaintiff's depression created functional limitations severe enough to render him disabled. As previously noted, Plaintiff's mental health records from March of 2004 through September of 2006 are unremarkable, excepting a dangerous drug interaction in the Summer of 2005, from which the Plaintiff quickly recovered.  During this period, Dr. Wassmuth, Plaintiff's treating physician, invariably assigned Plaintiff a GAF score of 81, indicating Plaintiff had minimal symptoms related to his depression.  On May 1, 2007, Plaintiff, who was cycling back into a period of depression, first began seeing Dr. Skorey.  For the next two months, Plaintiff remained in a depressed state; until, on July 23, 2007, Plaintiff first visited PA Middleton and reported his condition was much improved.  Thereafter, on August 22, 2007, Dr. Notch, a non-examining DDS physician, expressed that though Plaintiff appeared to have a severe condition, it was well controlled by medication.

However, the remainder of the record, from January 9, 2008, to September of 2009, indicates Plaintiff's depression took a turn for the worse; and Plaintiff's treatment team, consisting of Dr. Muller and PA Middleton, struggled to find

medication that could alleviate Plaintiff's symptoms. The problem with the ALJ's analysis, which, as previously noted, consists of a stew of facts taken from disparate portions of the record, is that it ignores the linear nature of time. At the risk of stating the obvious, a past condition of relative health cannot logically be used to mitigate later periods of illness.

Throughout the 2008 to 2009 period, Plaintiff saw three medical providers: Dr. Muller, Dr. Blankenship, and PA Middleton. On January 9, 2008, PA Middleton indicated Plaintiff was showing "chronic disability despite multiple attempts at different medication regimes." Tr. 520. On January 23, 2008, Dr. Muller indicated Plaintiff was cycling back into depression. Tr. 519. Though there is some indication Plaintiff's depression improved in mid-2008, in February of 2009, PA Middleton noted that Plaintiff would find any sort of employment exceedingly difficult, if not impossible. Tr. 514. On May 26, 2009, Dr. Blankenship indicated Plaintiff's anxiety and depression were not "currently well controlled." Tr. 486 and 495. On June 22, 2009, PA Middleton indicated Plaintiff was still unable to

work due to the unpredictability of his moods.  Tr. 206.  On June 29, 2009, Dr. Muller indicated Plaintiff would have difficulty with any conflicts at work and regularly attending a job.  Tr. 511.  Throughout much of this period, Plaintiff was experiencing thoughts of death and suicide, problems with memory, problems with energy level, problems with motivation, and problems with judgment.  He also exhibited slowed thought processes and psycho-motor retardation and tested positive for agoraphobia, a fear of crowds, and anhedonia, a general inability to experience pleasure.

In relation to Dr. Muller's opinions, the ALJ merely indicated that he "did not state that" Plaintiff "was completely unable to work" and failed to provide any limitations inconsistent with the ultimate RFC determination. Tr. 21.  Both of these assertions are simply inaccurate.  Dr. Muller specifically referred to Plaintiff's "problems with decreased attention . . . history of fatigue," and problems with punctuality" and an "ability to come to work" due to his recurrent depression.  Tr. 510-511.  None of these limitations are reflected in the ALJ's RFC assessment.  In addition, though Dr. Muller did not indicate, without a shadow of a

26

doubt, Plaintiff could not hold down a job in the national economy, he did indicate Plaintiff would have difficulty dealing with "any type of conflict at work."  Tr. 511 (emphasis added).  He also indicated that, if Plaintiff were to work, he would likely only have "further problems with . . . depression," which is about as close as one can come to indicating a plaintiff cannot work without spelling it out. Tr. 511.  Even if this Court is reading Dr. Muller's notes incorrectly, and he was not implicitly indicating Plaintiff was incapable of full time work, it is completely unnecessary for him to do so.  The system established under the regulations require the ALJ to develop an RFC based on the most persuasive medical evidence of record and then determine whether a Plaintiff is capable of full-time work based on reliable vocational evidence.  An ALJ should not become the doctor by paring down medical opinions that are otherwise uncontradicted on the record, and a doctor should not be forced into the role of a vocational expert.

The ALJ simply failed to comment on Dr. Blankenship's opinion.  Though Dr. Blankenship saw Plaintiff for his physical problems and is not a licensed psychiatrist or

psychologist, he is a doctor who is qualified to recognize the symptoms of depression, and his opinions fortify the conclusions of Dr. Muller and PA Middleton.  The ALJ's failure to consider or even comment on Dr. Blankenship's opinion was clear error.

The ALJ did spend a significant amount of time discussing the opinion of PA Middleton.  He criticized her on the following bases:  (1) her opinion that claimant could not work is reserved to the Commissioner; (2) her opinion most likely related to the Plaintiff's ability to perform her past work as a teacher, rather than other work in the national economy; (3) she failed to provide specific functional limitations; (4) her opinion was inconsistent with multiple GAF scores indicating only moderate limitations; and (5) her opinion was inconsistent with the opinion of Dr. Muller.  Tr. 21.

While it is a truism that a disability determination is strictly within the province of the Commissioner, "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."  S.S.R. 96-5P, 2. Naturally, PA Middleton's opinion that Plaintiff is unable to

work is not somehow discredited because of her unhedging clarity.

The ALJ's second criticism is speculative.  There is no indication PA Middleton was only referring to Plaintiff's ability to work as a teacher and not his ability to work generally.  On the contrary, PA Middleton indicated Plaintiff was unable "to be out in the world in any way," which not only strictly implies Plaintiff was unable to perform any job but also that Plaintiff was unable to do basic human activities, whether work related or not, outside of his home.  Tr. 514.

The ALJ's assertion that PA Middleton failed to provide specific functional limitations is not accurate.  She indicated Plaintiff suffered from psychomotor retardation, had problems with memory and judgment, lacked the ability to interact appropriately with others, and suffered from variability in symptoms, making it "very difficult for him to have a level of reliability in terms of his function on any given day."  Tr. 206, 207, and 514.

The ALJ is correct to note that PA Middleton's opinions were not always reflected in Plaintiff's GAF scores.  However, the ALJ's criticism misunderstands the nature of the GAF.  The

29

GAF reflects a patient's "overall level of functioning" at a given time.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).  It neither purports to identify a Plaintiff's level of functioning a week from the clinical interview in question nor a week after.  It is a truism that mental disorders wax and wane in time.  This is especially true of Bipolar Disorder.   In addition, Plaintiff's treatment providers did not assign him a GAF each and every time he visited them.   While multiple GAF scores indicating a plaintiff has severe functional limitations on given days may demonstrate that a plaintiff lacks the functional capacity to work consistently over an extended period, multiple high scores simply do not as strongly support a contrary inference, especially when there is, as here, multiple observations from medical professionals indicating a plaintiff's symptoms, at times other than when a GAF was completed, were severe.  While an RFC refers to the most a plaintiff can do, this is distinct from the most a plaintiff can do when at their best. Furthermore, the GAF scores in the 70's and 80's the ALJ relies upon were assigned from 2004 to 2007.  As previously

noted, the medical records for this time period are insufficient to establish disability. However, Plaintiff's GAF scores from this period are irrelevant when considering Plaintiff's functional limitations after the beginning of 2008. Since 2008, Plaintiff has received only one GAF assessment. On June 29, 2009, Dr. Muller assessed Plaintiff with a GAF of 55, indicative of moderate difficulty in social and occupational functioning, but this hardly constitutes substantial evidence on the record as a whole sufficient to discredit the opinion of PA Middleton, whom treated Plaintiff over a two year period.

The ALJ's contention that PA Middleton's opinions are contrary to the opinions of Dr. Muller is also usupported by the record. PA Middleton and Dr. Muller were part of the same treatment team. In addition, as previously noted, Dr. Muller expressed grave doubts about Plaintiff's ability to work. The only apparent difference between PA Middleton's opinion and Dr. Muller's opinion is that PA Middleton saw Plaintiff more often, and so her observations were more frequent and her conclusions more resolute.

On the whole, the ALJ's basic error was attempting to discredit the opinions of Plaintiff's treatment team during the period from 2008 to the close of the record without reference to any contradictory medical evidence from this time period.   Simply stated, there are no medical opinions on record that can logically detract from the opinions of PA Middleton, Dr. Muller, or Dr. Blankenship, and, therefore, the ALJ's decision not to include all of the functional limitations these doctors identified is tantamount to the ALJ "playing doctor."   See Pate-Fires, 564 F.3d at 946-47.

The assessment of mental "functional limitation is a complex and highly individualized process that requires" consideration of "multiple issues and all relevant evidence to obtain a longitudinal picture" of a plaintiff's "overall degree of functional limitation."   20 C.F.R. § 404.1520a. Again, the only mental functional limitations the ALJ assigned Plaintiff related to his ability to interact socially, resulting in an understatement of the findings of Plaintiff's treatment team.   The ALJ should have also accounted for Plaintiff's lack of energy and motivation, his problems with memory and judgment, his slowed thought processes and psycho-

motor retardation, and the unpredictability of his overall mood.

### D.   Layperson Evidence

In crafting an RFC, the regulations explicitly require an ALJ to not only weigh the medical evidence but also consider lay observations of a Plaintiff's limitations, including limitations attributable to a Plaintiff's subjective accounts of pain or other symptoms.  20 C.F.R. § 404.1545(a)(3).  Based on the general substantial evidence on the record as a whole standard of review, a District Court should defer to an ALJ's determination that a plaintiff's allegations lack credibility "as long as the ALJ explicitly discredits" layperson "testimony and gives a good reason for doing so."  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)).

In Polaski v. Heckler the Eighth Circuit held that an ALJ must not dismiss a plaintiff's subjective allegations based solely on a lack of objective evidence.  739 F.2d 1320, 1322 (8th Cir. 1984).  An ALJ must consider all evidence, including a plaintiff's work record, statements from physicians, and statements from third parties relating to the following:

33

> 1) the [plaintiff's] daily activities;
> 2) the duration, frequency and intensity of
> the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects
> of medication; [and]
> 5) functional restrictions.

Id.

In this case, the layperson evidence consisted of letters, testimony, and forms filled out by Plaintiff's former supervisor, the Plaintiff's brother-in-law, the Plaintiff's brother, the Plaintiff's wife, and the Plaintiff himself. The evidence paints a picture of someone whose moods have grown increasingly unpredictable, who often cannot leave the house to work or socialize with friends and family, and whose depression causes deficits in his ability to remember, concentrate, and complete tasks.

The ALJ criticized Plaintiff's subjective allegations on several bases:  (1) Plaintiff's brief stint as a substitute teacher from 2006 to 2007 are contrary to his allegations; (2) Plaintiff's reliance on Dr. Muller's treatment notes in an interrogatory undermines his credibility; (3) Plaintiff's extensive travels from 2004 to 2007 are not the actions of someone suffering from a disability; (4) Plaintiff's plans to

34

go to welding school were contrary to his allegations; and (4) Plaintiff sought treatment only once every 5 months.

Though the record indicates Plaintiff did work as a substitute teacher for brief periods in 2006 and 2007, this does not undermine his credibility.  First, Plaintiff has never denied that, at that time, he was capable of and was actually engaged in part time work; but a capability to perform part time work is simply not the same as a capability to perform full-time work.  Second, the information provided by Plaintiff's supervisor clearly indicates that as of 2004, Plaintiff was no longer able to perform his jobs on a full time bases.  By 2004, Plaintiff was becoming combative, unpredictable, and, due to his depression, was repeatedly absent.  Third, the very nature of substitute teaching allowed Plaintiff to pick and choose when he was going to work, eliminating the problems related to the unpredictability of Plaintiff's mood swings that any other type of full time employment would have entailed.

Though the ALJ does not cite to the record, the Plaintiff at some point apparently referred to Dr. Muller's treatment notes in order to support his claim of disability.  This Court

does not understand how this could undermine his credibility. Though Dr. Muller, as the ALJ noted, gave Plaintiff a GAF of 55 within the treatment notes to which Plaintiff apparently referred, the GAF, as previously discussed, assesses a plaintiff's social and occupational functioning in reference to a specific time.  It does not purport to identify a Plaintiff's functional capacity over an extended period of time.  Within these same notes, Dr. Muller indicated Plaintiff would "have difficulty with any type of conflicts at work" and going back to work would only "cause him further problems with his depression," and it was these statements that contemplated Plaintiff's long-term prospects, not the GAF score.  Tr. 511.

The ALJ's assertion that Plaintiff extensively traveled from 2004 to 2007 is inaccurate.  The record only establishes that Plaintiff went on two trips in 2004, one to England and one to Wisconsin.  Tr. 379-80.  On both trips, he was accompanying his wife who was attending work related functions.  Id.  Post the ALJ's decision, Dr. William C. Deeds, Plaintiff's wife's boss, wrote the Commissioner to indicate that Plaintiff only went on the trips with his wife because he did not want to stay home alone while depressed.

Tr. 6. Furthermore, as previously discussed, this Court agrees with the ALJ that Plaintiff has failed to meet his burden of proof to establish disability from 2004 through 2007; however, any of Plaintiff's travels during this period are simply irrelevant for determining whether he became disabled in the beginning of 2008.

Notes from Dr. Wassmuth, dated August 15, 2005, indicate Plaintiff's depression was well under control, and he was contemplating attending welding school. Tr. 383. However, Plaintiff only attended welding school for two days in 2005. Not only does a plaintiff's failed attempt to engage in another profession not weigh against his credibility, but it is irrelevant to whether Plaintiff was disabled beginning in 2008.

While a conservative treatment regime can be used by an ALJ to minimize a Plaintiff's credibility, the ALJ was inaccurate when he indicated Plaintiff only sought treatment every five months. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). From the beginning of 2008 to September of 2009, for instance, Plaintiff visited either Dr. Muller or PA

37

Middleton nine times, which averages a visit a little less than every other month.  Tr. 510-20.  In addition, while treatment nearly every two months may not seem to be a lot of treatment visits for a debilitating condition, it is significant that Plaintiff has struggled with Bipolar Disorder since 1973.  In other words, it has been part of his life for a long time, and, other than occasionally attempting to alter his medications, the record supports the fact that there is little that can be done for him.  Finally, though the Eighth Circuit considers conservative treatment to be a valid reason for doubting a Plaintiff's subjective allegations, this Court is persuaded it is tantamount to an ALJ "playing doctor" when the alleged conservative treatment was given by a treatment team that ultimately expressed opinions consistent with disability.  See Pate-Fires, 564 F.3d at 946-47.  If PA Middleton or Dr. Muller had thought Plaintiff's course of treatment made his allegations of debilitating depression not credible, they would have said so; and neither this Court nor the ALJ is in a position to doubt their professional judgment.

The Commissioner's Brief correctly points out that "an ALJ may properly discount subjective complaints if

inconsistencies exist in the record as a whole." Docket No. 13, 16 (citing <u>Wildman v. Astrue</u>, 596 F.3d 959, 968 (8th Cir. 2010) (other citations omitted). Dr. Wassmuth's treatment notes do vary from Plaintiff's subjective allegations. However, Plaintiff's first Adult Function Report was filled out in August of 2007, when Dr. Wassmuth was no longer treating Plaintiff. All of Plaintiff's subjective allegations were made when PA Middleton and Dr. Muller were treating Plaintiff, and, as previously noted, their opinions support Plaintiff's subjective allegations.

In relation to Plaintiff's wife's observations, the ALJ merely stated that she had a "pecuniary interest in a finding of disability." Tr. 18. To the extent immediate family members generally have some pecuniary interest in the health and well being of their loved ones, the ALJ's argument would nullify all such evidence. The Eighth Circuit has "frequently criticized" the failure of an ALJ "to consider subjective testimony of family and others." <u>Smith v. Heckler</u>, 735 F.2d 312, 317 (8th Cir. 1984). As previously noted, mental illness waxes and wanes over time, and Mrs. Knepper was in the best position of anyone on record to understand the long-term

effects of her husband's Bipolar Disorder.  In addition, there is an obvious social stigma attached to admitting that a family member suffers from mental illness, and the opinions of family members, rather than being inherently suspect as the ALJ maintains, can be very informative.  Particularly persuasive, in that it is clear and consistent with the medical evidence of record, is Mrs. Knepper's letter of July 22, 2009, written to the ALJ.  Tr. 220.  In pertinent part, it states:

> All that I said in my Dec. 7, 2007, statement is still true – only there is now virtually no hope that an antidepressant can be found that will work for John.  I had hoped that not working and a non-stress environment would lead to fewer times of depression, but this has not been the case. He has been seriously depressed nearly non-stop since 2007.  He has only occasional days when the depression lifts a little. Besides the inabilities to function already documented in his file, since 2007 I have noticed in John a slower processing of ideas, more shakiness in his hands, and a lack of balance when he moves.  His social isolation has increased.  His motivation to carry out simple activities has decreased. He spends many hours each day curled up on his chair . . . .

Id.

Finally, though the letters were submitted after the ALJ made his decision, the letters written by Plaintiff's brother and brother-in-law may be considered by this Court and support the Plaintiff's subjective allegations and Mrs. Knepper's observations.

Overall, both Plaintiff and Mrs. Knepper have consistently maintained that Plaintiff experiences mental functional limitations consistent with disability, and the ALJ failed to provide a reasonable explanation for doubting their credibility.

## V. CONCLUSION

It is clear the ALJ erred in a number of respects. The question then becomes whether this Court should remand for further consideration or solely for the purpose of awarding benefits. The Eighth Circuit has held that a remand for award of benefits is appropriate where "the record 'overwhelmingly supports'" a finding of disability. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (citing Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)).

After carefully considering the evidence, this Court is persuaded that Plaintiff and Mrs. Knepper's lay opinions, as

well as the medical evidence from January 9, 2008, to the close of the record, overwhelmingly support a finding of disability.   Therefore, the ALJ's decision is reversed and remanded solely for the calculation of benefits from January 9, 2008.

Application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA), must be filed within thirty (30) days of the entry of final judgment in this action.   Thus, unless this decision is appealed, if Knepper's attorney wishes to apply for EAJA fees, it must be done within thirty (30) days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 27th day of September, 2012.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa